Here is the first case, Platinum-Montaur. Good morning, Your Honors. Good morning. Please, the Court. My name is Robert Burns from the law firm of Holland & Knight, and I represent Appellant Platinum-Montaur Life Sciences, LLC, and specifically the court-appointed liquidators of Platinum Partners Value Arbitrage Fund, or PPVA, which is the operating member of Platinum-Montaur. Your Honors, the district court incorrectly decided that the assignment agreement between Platinum-Montaur and its affiliate, PPCO, was unambiguously a complete assignment, such that Platinum-Montaur was stripped of standing as a matter of law. Can you walk us through your textual argument? Absolutely. Because I'm having some difficulty seeing where the ambiguity is. So, looking at the assignment agreement, which is at Appendix 91 through 94, on Paragraph 1, the assignment purports to convey all of the right title and interest to the asset as defined in Appendix or Exhibit A to the assignment agreement, including all monies due, all interest payable and due, et cetera, et cetera. Which part of Exhibit A is the definition of the asset? Well, Your Honor, I think our position is you need to look at the entirety of Exhibit A to understand what asset means. And the reason for that is as follows. Although the center column of Exhibit A purports to, in quotes, define asset as the entirety of the note, and conceitedly that's troublesome language for our position, when you look to the subsequent columns, and specifically looking first to the accrued interest, because I think the disconnect is most clear there. So this says accrued and unpaid interest purchased. The disconnect between what? It's the disconnect between the amount purchased and the amount that was actually due at the time. So the law permits the Court, in fact encourages the Court, to look at the circumstances in which a contract was executed to determine whether there's ambiguity. And the circumstances here, relevant circumstances, at a minimum would include the amounts that were actually due and payable by NVIDIA to Platinum Montour at the time of the assignment agreement. So was this a mistake, the amount not matching up with the definition that you're describing? It's hard for us in our position as counsel for the liquidators to know specifically the gentleman who signed this document on behalf of both parties. We know that the party shared a contractual intent because the same gentleman signed on behalf of both contractual parties. But that gentleman was one of the primary executives of Platinum, and for reasons that Your Honors may be aware of relating to criminal proceedings across the river, he's not available to us. So we only have what's here. And it would appear that there's a mistake somewhere in the document. What about Exhibit A? I mean, Exhibit A at 94 defines the asset as the entirety of that subordinated promissory note dated July 25, 2012, as amended, issued by NVIDIA Biopharmaceuticals, Inc. to Platinum Montour Life Sciences in the initial principal amount of $6,650,869.35. And Exhibit A also lists, and I quote, principal indebtedness outstanding under instrument, that same amount, the accrued and unpaid interest purchased, if any, $461,845.86, and the purchase price $7,022,715.21. Correct, Your Honor. Can I just ask a couple of questions here? Of course. First of all, the note speaks and the exhibit speak of a principal indebtedness in the note of $6,560,000, right? That's correct, Your Honor. And that actually, at the time of the assignment, was incorrect. That's correct. At the time of the assignment, it was at least $7.7 million. $7.7 with another $700,000 in interest. That's right. So it could have conveyed that principal indebtedness outstanding under the instrument, but not conveyed the balance under those circumstances. Isn't that right? Well, that's precisely our position, Your Honor. Now, when it says the entirety of the note as of that date, that doesn't necessarily mean, in the, I'm looking at the exhibit, Exhibit A, but I'm also looking at the assignment agreement itself, transfers the right title and interest under the asset. So the asset at that time was the $6.5 million. Well, right. Or was it more than that? Well, as you define the, it depends on how you define the asset. I mean, our position. Well, let me just say. It says, it goes further than that. It says S&E of all the right title and interest into and under the asset set forth opposite its name on Exhibit A. And the asset set forth opposite its name is a note in the amount of $6,560,000. And so the entirety doesn't speak of the overall indebtedness. It speaks of just the entirety of that lesser amount. Correct, Your Honor, is our position. So it didn't purport to convey the entire, under one reading of this, you could say it didn't purport to create, to convey the entirety of the indebtedness. It said the entirety of the subordinated note, and then it gave a principal indebtedness amount, which was incorrect as far as the overall indebtedness was concerned, correct as to the note, as to the note that's referred to in here. So that $6,560,000 would refer to an indebtedness at a point of time which wasn't accurate. That's correct. Either it wasn't accurate or was in an expression of interest that the two contracting parties, PPCO and Platinum Montour, intended to convey some of it to PPCO, but not all of it. Now, of course, if we can get past the question of whether this is unambiguous or not, we then could look at all the SEC filings and the relationship between the parties and so forth. And if I go to the note itself, it seems like it's sort of a hodgepodge of things. It's Assanese, all right, title and interest under the asset, and the asset is this lesser amount. And then all payments respect thereof and all monies due, all relating to that particular asset. And then, and then, then after that, it goes into under B, such as and ors pro rata portion of any and all security interests and liens, pro rata portion of guarantees and indemnities, pro rata portion of all cash investments, and pro rata portion of all income payments and proceeds. So what, what is the pro rata having to do with this, if it isn't partial? That's your point. Fisherman, Is, is, is a reading. Roberts, In other words, it's in tension with the idea that this is a complete conveyance of everything, right? Because there wouldn't be any pro rata involved if it was a complete conveyance of the entire indebtedness. Fisherman, Precisely. And, and, I mean, I don't know. Roberts, So doesn't that, my guess is, and this is really for your adversary, I guess, but I'm trying to work this through. So that, that itself might create an ambiguity, correct? Fisherman, That's right, Your Honor. Obviously, the, the goal is to try to harmonize the contractual provisions to the extent possible. But looking at these four pages in the context of the amounts that were currently due at the time, there are certain, there are certain provisions that simply can't be harmonized. There, there appear to be. Roberts, Well, it also can't be explained if you, if you, if, if this is supposed to be a complete assignment of the indebtedness, because of the entire indebtedness, because you wouldn't have the partial aspects of it. I don't think. And I'm, I mean, that's the, your, your objective here is to convince us that there's some ambiguity or an incomplete assignment that didn't cover the entire indebtedness. Fisherman, That's correct, Your Honor. Roberts, And, and, and if, if, if there's an ambiguity, then once that happens, then we can, we can look at its extrinsic evidence. Fisherman, That's, that's correct. And the extrinsic evidence, Your Honor, is, is, is, is, is basically on your side. Roberts, Right. Yeah. Before you sit down, can I ask you a question about jurisdiction here? It's not clear to me that there's diversity jurisdiction. And it, it, it seems like that wasn't something that was resolved below. And so I'm, I'm trying to figure out what's the citizenship of your client? Fisherman, The, the answer is it's complicated, Your Honor. So our client, Platinum Montour Life Sciences LLC, is owned by, among others, the operating member, the operating member of Platinum Partners Value Arbitrage Fund, which is, I think, a limited partnership. Going up the chain, there are innumerable entities. We raised this issue. So we initially filed this case in State court. Roberts, 220. That's, I mean, that's not innumerable. It's a lot, but. Fisherman, If, if, if, if that's, if that's what, I'll, I'll take Your Honor's statement on that. I, I can't recall because it was several years ago that our, we were. Kagan, So the difficulty, as I understand it, would be that the, the citizenship of your client would depend on the citizenship of those. Fisherman, Everyone upstream. Kagan, Right. And, and if there's 200 plus of those, the, the question would be, is any one of them a Delaware citizen? Fisherman, That's right. Kagan, And at least one of them, as, as I understand it, was, is a, is or was a Delaware  Fisherman, There is a suggestion of, of that, Your Honor. Kagan, Right. And that, while that's not dispositive of the citizenship being in Delaware, it seems at least to kind of raise a question about whether there's diversity. And, you know, so I, I guess it sounds like you're saying you don't know. Fisherman, That's right, Your Honor. We, which is the reason why we filed the case in state court. It was removed by the defendant. We, we alerted the district court to the issue immediately. She said, why don't you go and make some informal inquiries? Not surprisingly, we made those informal inquiries, and the investors in these series of, of hedge funds were not entirely forthcoming in response to that. We told the judge that, Kagan, With further jurisdictional discovery that it is knowable, is it not? Fisherman, Oh, it is, it is certainly knowable with further jurisdictional discovery, Your Honor. The, and we said, Kagan, Why don't we know it? Fisherman, Because we told the district court of, of these circumstances. The district court said she was inclined to, initially said she was inclined to order some sort of jurisdictional discovery, make the defendant pay for it, because the reason why we were in federal court was because of the removal by defendant, because it would be a costly exercise. And ultimately, she concluded, based on what I see in front of me, I have no reason to disbelieve that I have diversity jurisdiction. That, that was how it was resolved. And did she know at the time that there was, you know, one of the citizens, the citizenship dependent at least, and one of them was a, a Delaware trust? Fisherman, We certainly brought that to, to the court's attention in, in our submissions on, on the jurisdictional issue, yeah. Kagan, Because that seems to me to be a, a basis to think that there is not diversity. Fisherman, It, it was certainly suggestive of that. Our informal efforts to reach out to those particular parties that you're, you're referring to, per the court's, per the district court's order, were met with stony silence. So, for that to be resolved, it would have required some sort of more formal discovery that ultimately wasn't engaged in. If we were to, to just hypothetically, agree with the contractual interpretation of the district court, and were to resolve this on the merits, rather than on article three standing, what then, if anything, should we do? Is there anything more in terms of further proceedings that would flow from that? Fisherman, Well, in terms of further proceedings, if, if Your Honor were to, if the court were to affirm on the basis, not of, not of article three standing, but on the basis that the contract- Kagan, Is unambiguous, yeah. Fisherman, Is unambiguous, and therefore, Platinum Montour has no interest, has no remaining interest, so sort of standing, but depends on whether it's 12B6 or 12B1. Then the question, of course, is someone, someone has standing, because Platinum, because NVIDIA acknowledged that it still owes $2 million to someone. PPCO is obviously the, the logical party for that, but as we note in the briefs, PPCO thought it only held a fraction, not the whole. So PPCO, after being paid for its fraction, said, we're good, we're fully paid, we're done. So PPCO is, you know, the party that potentially would have standing under that court's construction, but because it thought it had only had a partial assignment and held only a portion, it, it gave away, it gave away any rights to enforce the rest. So it's, so, so I guess that's a long way of saying, I don't know, Your Honor, that it would be confusing. Roberts, I'd like to just touch on something else, and that is the unjust enrichment point, because if, if, in fact, we were to say that this was a complete assignment, then, plainly, this was a mistake on the part of both, both sides, because they didn't treat it that way. And they never thought of it that way until NVIDIA finally took a look at and, and closely read the agreement. But they always thought this was a partial assignment. And so that would be a, there would be, obviously, a windfall to NVIDIA and here. And then it seems to me that even though there is a note here, because of the circumstances, it's plain to me that the, because of the windfall aspect of it and the mistake that, and maybe a mutual mistake, that there ought to be some, some relief on that, on, on, on a quasi-contract basis of some sort. Or, you know, or you know, unjust enrichment. And that's, that's the question I have. Wouldn't that be, wouldn't that be so? Well, responding to your mutual mistake point, I think your Honor's entirely correct. That if this were a case between Platinum Montour on the one hand and PPCO on the other, regarding the assignment agreement, Platinum Montour would have a clear case for reformation of the instrument based on mutual mistake. Right. Both parties understood it to be a partial assignment. And, and acted as such, and, and as I just explained to, to Judge Katzman, the, the fact that PPCO not only believed such, but actually took affirmative steps in, in furtherance of its belief by saying, now that we've been paid our 7.7 million, which is all that we think we're owed, we're done, we're good, we're, we're, it's over. There is the, the, there is the $2 million windfall hanging out there. So, I mean, to the, so, to the extent. That is, is whether you could rectify that in the face of the fact that the, the assignment, and, you know, that, that, that's, you know, that's a, I think an interesting first year contract question. Right, and, and our research was unilluminating on that. We found a, found a district court opinion saying the, the views of the contracting parties that matter, and a non-party to the contract urging a construction which is at odds with what both contracting parties agree to, doesn't fly, it's what the contracting parties thought. That's, that's the best, that's the best we could do in our research. Thank you. Thank you, your honors. Good morning, your honor. May it please the court. I am Robert Folland of law firm Barnes and Thornburg, LLP. On behalf of, here on behalf of Namidia Biopharmaceuticals, Inc. And I, I note from my colleague on my left here that he didn't get very far into his argument before the question started. And I suspect the same questions will be, be coming my way. Is that your preference? You can start answering them. You can start answering before we ask them. I'll answer them before we ask them. Well, I'll, I'll, I'll take, I'll take you up on that, your honor. Having looked at, at the narrative, having looked at the facts we don't think this, this is ambiguous at all. And there certainly is extraneous evidence that's been put forth in narrative form by Platinum Montour, arguing as to why it should be ambiguous. But that's only part of the story. There's plenty of other extrinsic evidence and details out there that you could get into if you wanted to. Our point has always been, that's not necessary because- Well it's, your point really is that once you have, if you, if the contract is unambiguous, then you can't look at this extrinsic evidence. Exactly. You can't make a contract ambiguous, an unambiguous contract ambiguous by, by, through, by introducing extrinsic evidence. That, that's exactly right, your honor. That, that's- It's not simply that it's not necessary, as you said, but that it would be foreclosed. Right. And, and that's, that's a much better way to put it, your honor. So let's, let's talk about the, the, the agreement here. So the assignment purports to assign the asset, and the asset is a, a note in the amount, in a particular amount. That is not the actual amount of the indebtedness, so it didn't assign all of the indebtedness. It assigned the asset under the asset as specified in Exhibit A. And the asset is, is express, specified in Exhibit A was, was not the complete indebtedness. It, it said it was a principal indebtedness outstanding under the instrument, but then, then it wasn't. It wasn't the exact outstanding indebtedness at that time. Well- Correct? Our, in this point came up, I think, when my, when my colleague was speaking. But our view is that the description of the instrument is exactly what it says it is. And that is the assignment of the entire interest. When you're talking about the principal amount, the accrued unpaid interest, or the purchase price, that's really superfluous. No, I understand that, but it doesn't say, it actually doesn't say assign all the indebtedness. It talks about a particular instrument at a particular value. And that wasn't all the indebtedness. Well, it says the entirety of the subordinated promissory note of a subordinate. But, but also, but, but then, but that the entirety of the subordinated promissory note at that time was specified as a certain amount. And that's the entirety of that amount, yes. That was, that, that could, you could read that as being conveyed. But I don't see how you can read it as, as, as conveying the full 8.8.5 million or 7.8, 7.8 in principal at that point. Well, the, the, if we're going to look at extrinsic issues, it is possible that there was an assignment prior to this time. And so the issue here is not who is entitled to some of the. This wasn't the balance of the, my understanding, correct me if I'm wrong on the facts, is that at the time of the assignment, there was a, a balance, an indebtedness balance of principal that was greater than the 6.56 million. I think that is correct, your honor. And I think the records of platinum would say that that amount was owed to an individual who is the former CEO of NVIDIA, who is presently engaged, who's been terminated as the CEO of NVIDIA and is now presently engaged in litigation with NVIDIA.  That was the defense that was used by NVIDIA, not paying the balance early on, was that both PPC and NVIDIA, and NVIDIA's CEO were competing for that money. That is correct, your honor. But the thing that's clear is, of the parties out there that are claiming an interest in this, the one that's clear that doesn't have any interest is Platinum Montour Life Sciences. Because the clear intent of this document was to transfer whatever existed at this time on to PPCO. There's no intent, there's no residual interest being maintained. It didn't succeed in doing that, however. Well, they succeeded in transferring whatever they had. It's no different than a quick claim deed. Whatever they had, the language transfers in the entirety what it is. Now, the argument being, well, they actually had more than- That bears on this, that relates to the executive of NVIDIA? I haven't seen a note, your honor. There is clear documentation of an intent to make a transfer. Yeah. And the question is, is it- Now, how do you explain the, and what is the purpose of the pro rata distribution that's referred to here? If we're looking at the, just the four corners of the note itself. Well, I think- That's sections B through F of the note. And again, your honor, I think that's entirely consistent with an assignment of whatever was held by Platinum Montour Life Science at this time. They're saying, the pro rata share, if there's more out there, at the time this was drafted, I think that the drafter thought that there was something owed to this other individual that I mentioned. So, I think what they're getting at is, whatever- Maybe what they're getting at, but we're looking at whether or not this is ambiguous on its face with the pro rata portion. I mean, you're now trying to suggest that as to motives for that, but isn't that an ambiguity that one could- No, it's not, your honor, because this document, again, is evidence of a clear intent to transfer whatever is held at the point in time of the assignment being drafted from Platinum Montour to PPCO. Whatever that is, it's going from entity A to entity B. So the point is, there very well may be disputes or arguments out there as to one of three other parties being owed the balance of the note. The point is that we know there's one party that's not entitled to that amount, and that's Platinum Montour Life Sciences. Which is why it's entirely appropriate for the court at this time to dismiss this case, because- Assuming that you think that NVIDIA doesn't have to pay PPCO the remaining balance. Is that your view? If that is my view, it's based solely on the release documents. Is it your view or not? Yes, that is our view at this point, given the release documents that were signed. Does NVIDIA have any outstanding obligation at all? With respect to- The promissory note? There is a claim being raised by this third party individual with respect to that, who is claiming those funds. And is doing so to this day, and is engaged in litigation with NVIDIA presently. Didn't you take the position at some point in the litigation that it was either Platinum Montour or this person that was entitled to this amount, and that had to be determined? I believe, unless I made a misstatement somewhere, it was PPCO or this individual that would have had an interest. Our point has always been, I think consistent throughout this litigation, that Platinum Montour did not have an interest. So, just to be clear, I guess this is on appendix 19. You originally asserted that you didn't need to pay Platinum Montour, because some other entity transferred Platinum Montour's entitlement to payment under the note to the NVIDIA's president and CEO, Michael Goldberg. That was in the complaint, but then, Subsequently, my understanding is that you're saying that you've seen no documents that. Well, the answer is I haven't seen a note. We have seen documents that clearly evidence an intent to do a transfer between Platinum Montour and Dr. Goldberg. I haven't seen a partial note assignment, which is no difference in the fact that we haven't seen a partial note assignment here. We've seen an entire note assignment from Platinum Montour to PPCO, which again, just goes directly back to my point. There could be an issue here between certain parties. None of those parties are in the room presently, though. I thought the brief pointed out at some point that there was an SEC filing in 2016 after the assignment in which NVIDIA acknowledged that as of the year end of 2016, the outstanding principal balance on the note was approximately 9.5 million, and that NVIDIA had since paid PPCO approximately 7.7 million, and that a balance of approximately 1.9 million was due to Platinum Montour. Is that incorrect? I believe that is. The last part of that is incorrect. I don't believe that there's ever been an SEC filing that specifically said that the remaining balance was due to Platinum Montour. I believe it said there was a claim made for the funds by Platinum Montour. Mm-hm. But they, okay, but they, so there was a claim made. Right. The distinction being that I don't believe my client has ever acknowledged that there is a debt owed. They've always been of the view that there are claims that exist with respect to those funds, but they've never, at least to my knowledge, made the statement, Platinum Montour Life Sciences is entitled to the balance of the note. Mm-hm. I'd like to ask you about jurisdiction as well. Your client was the party sought to remove here. Correct. And isn't it your burden then to show diversity? Yes, it is, Your Honor. The challenge here, as my colleague raised earlier, is that it's complicated. It's based on up-chain parties that we don't have control over, that we would have to find through discovery. So isn't more discovery necessary then to figure out whether we even have jurisdiction here? I was satisfied based on the informal discovery and the evidence adduced. You were satisfied that what? That there was not any reasonable possibility that there was a nondiverse party. There was a reference to it. Can you explain that? I don't understand that. I thought there were over 200 entities that on whose citizenship the citizenship of the plaintiff depends on, and at least one of those is a Delaware trust, which certainly raises a, I don't know if it's a presumption, but a question whether that entity is a Delaware citizen. And if not, 200 others, it seems awfully likely to me that somebody is a citizen of Delaware, given all the LPs and LOCs involved. And I have to confess, it has been probably a year since I've looked at this, but my memory is that when looking at the trust, I was of the view that that Delaware trust would flow to the citizenship of the trustee, which I think I can't remember, but I don't believe was a Delaware citizen. And as far as the other individuals go, we believe that while we don't have a definitive answer, based on the information I received, it's very, very, very likely that we're talking about individuals that are residents of the state of New York or New Jersey or places like that. Can you explain that a little bit more precisely? What information did you receive, and why do you think it's very, very likely that none of them is a citizen of Delaware? Some of this came from some of my client contacts, which had some relationship with the platinum entities prior to going into the receivership, and their general knowledge of who the investors were and that sort of information. That was the main source of the knowledge, I believe. Was there an effort made to go through the list of entities and figure out what their citizenship was? And, you know, did you get halfway, two-thirds of the way through and figure out, oh, they're all New York, none of them is Delaware? Is that what you're saying? We got substantially through it. That's my memory of it. And Judge Caproni asked at some point of opposing counsel, what's your basis for your belief that there's a Delaware citizen here? And they said, well, we really can't point to anything specific. We're just concerned about it. And I think Judge Caproni rightly decided, well, if it's something we just have a generalized concern about, and rightly so. As an officer of the court, I think you should raise that if you're not 100% sure. But at some point, unless there's some articulable basis to believe that there's not diversity, I do think you have to proceed. Is that the standard? Where does that standard come from? There's not an articulable basis to believe that there's? Well, I apologize, Your Honor. I wasn't intending to state a legal position on that. And I agree that more discovery could be taken with respect to that. For whatever reason, it simply was not done. Before you sit down, let me ask you a question, this question. If, hypothetically, one were to agree with your or the district court's view as to the resolution in terms of contractual interpretation, from your perspective, does it matter whether we would affirm on the basis of standing or whether we affirmed on the merits? Your Honor, our original intent was seeking a resolution on the merits. At the end of the day, I don't know that it particularly matters, because if there's no standing, then I think the issue is resolved at that point as well. Unless Platinum Montour can come up with some other new note assignment or something like that, I think the distinction of with prejudice or without prejudice is largely meaningless in this case. Thank you. Thank you, Your Honors. Thank you, Your Honors. I had reserved two minutes, but seeing as I went badly over time in my initial argument. Well, that's because we ask you a lot of questions. If you want to use your two minutes, you can add. I have nothing further to add unless Your Honors have further questions for me.